## AFFIDAVIT OF VIVIAN M. BARRIOS IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Vivian M. Barrios, being duly sworn state:

## INTRODUCTION

1.    I have been a Special Agent for the Federal Bureau of Investigation ("FBI") since 2014 and am currently assigned to its Economic Crimes squad in Boston, Massachusetts. I received my Bachelor of Arts from the University of Colorado in 2002 and my Juris Doctorate from the University of Denver in 2005. In my current position as a Special Agent, I investigate white-collar crime, including money laundering, mail fraud, wire fraud, and bank fraud, among other offenses. I also have experience investigating telemarketing fraud, and through that work, have gained familiarity with computer and smartphone-based communication applications such as WhatsApp and Skype.

2.    I submit this affidavit for the limited purpose of establishing probable cause in support of a criminal complaint charging ROBERT POLANCO with money laundering, conspiracy to commit money laundering, wire fraud, and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1956(a)(3)(A), (B), and (h), 1343, and 1349, respectively.

3.    The facts in this affidavit come from my personal involvement in this investigation, my training and experience, other law enforcement agents, Co-Conspirator 1 ("CC-1"), and other sources identified below. This affidavit does not set forth all of my knowledge about this matter or investigation.

## PROBABLE CAUSE TO BELIEVE FEDERAL CRIMES WERE COMMITTED

4.    Based on the information provided below, there is probable cause to believe that starting on a date unknown but no later than January 2019, POLANCO and co-conspirators, including, without limitation, CC-1, an Indian national under indictment in the District of

Massachusetts; Co-Conspirator 2 ("CC-2"), who resides in the United States; and Co-Conspirator 3 ("CC-3"), who lives in India, agreed to launder the proceeds of wire fraud and drug smuggling schemes through accounts and businesses that POLANCO controlled.

5. In August 2019, the FBI arrested CC-1 in the United States on charges that included wire fraud, conspiracy to commit wire fraud, and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1349, and 1028A, respectively. After CC-1's arrest, CC-1 briefly cooperated with the government in hopes of receiving a reduced sentence if he or she pleaded guilty. CC-1 ultimately did not enter into a cooperation or a plea agreement with the government, pleaded guilty, and was sentenced and imprisoned. In pleading guilty, CC-1 admitted that he or she conspired to and did defraud victims by tricking them into believing that malware had infected their computers (and into paying to have it removed), and by later falsely telling the victims that their payments had been erroneously refunded, thereby tricking them into sending more money to the co-conspirators.

6. CC-1 has since been charged in the District of Massachusetts with other crimes, including making false statements during his purported cooperation, in violation of 18 U.S.C. § 1001, and substantive drug charges related to the money laundering described below. During CC-1's cooperation, CC-1 identified POLANCO as a money launderer who moved the proceeds of his technical support fraud schemes. As detailed below, federal law enforcement officers supervised and directed CC-1's participation in a covert operation targeting POLANCO. The operation involved, at times, federal law enforcement personnel assuming CC-1's identity during communications with POLANCO.

7. Since the covert operation, as detailed below, I became aware of CC-1's prior conspiracy with POLANCO involving his laundering of proceeds from the smuggling of illegal drugs, including controlled substances, into the United States.

*Money Laundering*

8. On or about October 20, 2019, CC-1, in Massachusetts and operating at the direction and under the supervision and control of federal law enforcement personnel, asked POLANCO by WhatsApp to launder a $5,000 "fake wire" from a computer technical support call center. Based on my experience and training, and my knowledge from this case, I directed CC-1 to refer to the transfer as a "fake wire" because it was consistent with CC-1's prior communications about money laundering with co-conspirators. POLANCO agreed to launder the money for a fee of approximately $1,750. POLANCO directed CC-1 to wire the funds to an account in the name of Polanco Travel, Inc. in Kansas.

9. On or about October 31, 2019, law enforcement personnel wired $5,025 wired from a covert law enforcement account in Massachusetts to the account of Polanco Travel, Inc.. On or about November 1, 2019, Polanco Travel, Inc. wired $4,900 to a bank account in the name of Entity A, a business created and controlled by CC-2.

10. On or about November 1, 2019, POLANCO used WhatsApp to communicate with CC-1 in Massachusetts. POLANCO sent CC-1 a photograph of a wire receipt showing that Entity A (CC-2's business) had wired $3,200 to a second covert law enforcement account (as CC-1 had requested at the direction of law enforcement). On the same day, CC-2 disbursed the remaining funds in the Entity A account ($1,655) by wiring $700 to an account in India in the name of RMP Aviation Services; transferring $455 to another one of CC-2's financial accounts; and wiring $500 to the account of Entity D, a company controlled by CC-2.

### *Money Laundering Conspiracy*

11. POLANCO and CC-2's actions above are overt acts in furtherance of a money laundering conspiracy that began no later than January 2019. The object of the conspiracy was to enrich the co-conspirators by earning fees for promoting and concealing specified unlawful activities, as defined by 18 U.S.C. § 1956(c), including wire fraud (18 U.S.C. § 1343) and smuggling of illegal drugs into the United States (18 U.S.C. § 545).

12. The manner and means of the money laundering conspiracy included the following:

   a. POLANCO and his co-conspirators opened and controlled bank accounts, including at Small Business Bank, HSBC Bank, Radius Bank, and Citibank, for entities such as Polanco Consulting Services and Polanco Travel, among others, to received and to disburse criminal proceeds.

   b. POLANCO and his co-conspirators opened and controlled merchant accounts (credit card processing accounts) that purported to be for travel-related businesses, to conceal and to disguise (as well as to receive and to disburse) criminal proceeds.

13. POLANCO and his co-conspirators performed the following overt acts, among others, in furtherance of their conspiracy to launder the proceeds of wire fraud:

   a. In or about April 2019, CC-2 coordinated the formation of Entity D with another co-conspirator in the United States.

b. In or about June 2019, a co-conspirator opened the Polanco Travel Inc. account for Entity A at Small Business Bank.

c. On or about July 19, 2019, POLANCO asked CC-3 if CC-3 knew of any call centers that needed credit card processing with "fast payouts" at a fee of 30 percent of the proceeds.[1]

d. On or about November 13, 2019, POLANCO told CC-3 that he had a bank account for wires, that he would charge 30 percent for wires over $10,000 and 35 percent for wires under $10,000, and that he could wire the funds to CC-3 in India.

e. On or about November 25, 2019, a known co-conspirator opened a bank account for Entity C at HSBC Bank.

f. On or about December 3, 2019, CC-3 told POLANCO that the wires that POLANCO would receive pertained to a refund fraud scheme.

g. On or about December 4, 2019, POLANCO offered CC-3 the use of a bank account in Costa Rica where he would pay the bank manager, who was "totally aware of what we [are] doing and will ensure nothing happens to the money"; POLANCO also told CC-3 that the wires should be identified as funds for the purchase of beach property.

---

[1] The communications with CC-3 detailed herein are part of a chat message transcript that the government obtained by search warrant from POLANCO's personal email account. I have personally reviewed all of the referenced communications. In the chat chain, CC-3 identifies himself/herself by name and states that he/she is a broker for multiple call centers in India.

h. Also on or about December 4, 2019, CC-3 told POLANCO that the call center he worked for had made $20,000 that would "hit [the] bank today," and POLANCO responded, "Yes saw that."

i. On or about December 5, 2019, POLANCO offered CC-3 the use of an account at HSBC in the name of an entity POLANCO controlled.

j. On December 7, 2019, CC-3 told POLANCO that Victim A had already sent a $35,000 wire to the HSBC account; HSBC records for POLANCO's account show the transfer took place on December 6, 2019.

k. On or about December 9, 2019, CC-3 told POLANCO to expect a wire for $9,500 from Victim A's bank and that the money had been "deducted from her account." HSBC records for POLANCO's account show a $9,500 payment from a bank account in Victim B's name and the transferred of $9,391 out of the account by cashier's check to Entity B.

l. On or about December 13, 2019, CC-3 told POLANCO to expect a transfer of $99,900 from Victim B at HSBC Bank into the HSBC Bank account POLANCO previously identified. The bank's records show a $99,000 transfer from Victim C on the same day.

m. On or about December 17, 2019, CC-3 told POLANCO to expect a wire of $55,000 to the HSBC account; HSBC Bank records show that Victim A had wired $55,000 to POLANCO's account the day before.

n. On or about December 17, 2019, the POLANCO-controlled HSBC Bank account issued a cashier's check for $153,337 to Entity C, and the HSBC Bank account was closed.

  o. On or about December 26, 2019, POLANCO gave CC-3 the account information for the Polanco Travel bank account that POLANCO previously gave CC-1 (see paragraph 8 above) for wires under $100,000.

  p. On or about December 28, 2019, CC-3 alerted POLANCO that he could expect a wire for $6,000 from Victim D; the Polanco Travel bank account records show a $6,000 wire from the day before from an account held by a person with Victim D's last name; the bank records further show that on or about December 30, 2019, the Polanco Travel bank account wired $5,950 to Entity D's account at JP Morgan Chase bank with the notation, "Consulting invoice." JP Morgan Chase bank records for Entity D show receipt of a wire for $5,950 from Polanco Travel and a later international wire transfer to the Indian bank account of Entity F, an aviation company controlled by POLANCO.

  q. On or about January 2, 2020, CC-3 told POLANCO to expect a $5,000 wire from Victim E's Wells Fargo account into the Polanco Travel account; that same day, the Polanco Travel account received a $5,000 wire from Victim E's Wells Fargo account.  (Wells Fargo recalled the wire on suspicion of fraud).

  r. On or about January 11, 2020, POLANCO told CC-3 that wires should only go to Entity D (which was controlled by CC-2) and that Entity D was "from one [of] my best friends and will pay."

14. POLANCO and his co-conspirators performed the following overt acts in furtherance of the money laundering conspiracy concerning illegal drugs:

    a.    In about January 15, 2019, POLANCO agreed to launder the proceeds of CC-1's illegal drug business; their agreement, which is memorialized in a WhatApps chat that I have reviewed, specifically contemplated that POLANCO would launder the proceeds of sales of controlled substances, including oxycodone, hydrodone, Xanax, and Adderall, as well as non-controlled prescription drugs.

    b.    Records from POLANCO's merchant account vendor show that on or about March 4, 2019, a customer purchased a ticket from a purported travel entity controlled by CC-2; in fact, the customer, whom I have interviewed, did not buy an airline ticket; instead, he had tried to purchase Viagra from an internet site, but actually received "Cenforce-100 Sildenifil Citrate Tablets IP 100 mg," a generic formulation of the active ingredient in Viagra that is not approved for distribution and sale in the United States by the Food and Drug Administration.

    c.    Records from POLANCO's merchant account vendor show that on or about March 9, 2019, a customer purchased a ticket from a purported travel entity controlled by CC-2, when in fact, the customer, whom I have interviewed, did not buy a ticket but, rather, attempted to purchase Viagra.[2]

---

[2] A spreadsheet of sales conducted by CC-1 that I have reviewed shows that CC-1 shipped the customer an illegal Indian generic formulation of sildenafil.

d. On or about March 11, 2019, POLANCO explained to CC-1 that his pharmaceutical customers should expect to receive receipts that purported to be for air travel and that he should tell his customers to tell POLANCO's merchant account vendor that they had purchased airline tickets.

e. Also on or about March 11, 2019, an employee at POLANCO's merchant account vendor emailed CC-2 requesting documentation that would verify that a list of CC-2's customers had purchased airline tickets. The list included the customer I interviewed (who had purchased drugs).

f. The next day, CC-2 emailed the merchant account employee in response: "Sorry for the delay, we wanted to make sure we provide the most accurate information to the best of our knowledge. Even though we are a VTC we have fully functional travel operation except the ticketing authority . . . . Most of the information had to come from India office. So due to time zone difference it took me a little bit of time. Also some tickets were issued yesterday as they were from last weekend, so that also took us some. I hope you understand this."

g. CC-2 attached to his or her email a series of purported flight itineraries issued by a travel agency in Houston, Texas, including an itinerary for the customer, discussed above, who had tried to purchase Viagra but actually received an illegal Indian generic drug. The itinerary falsely stated that the customer would fly roundtrip on Jet Blue from Ft. Lauderdale, Florida to Las Vegas, Nevada.

*Wire Fraud*

15.     On or about November 13, 2019, at the direction and under the supervision and control of law enforcement, CC-1 asked POLANCO to launder $15,049 from a computer support call center, and POLANCO directed CC-1 to wire the funds to an account in the name of Polanco Consulting Services at Radius Bank in Boston.

16.     On or about November 14, 2019, law enforcement personnel wired $15,074 from a covert law enforcement account to the Polanco Consulting Services account at Radius Bank.

17.     On or about November 18, 2019, in what I believe based on the activity described below was an attempt to deceive CC-1, POLANCO messaged CC-1 that the wire had not come through and that Radius Bank had called him to say the transaction was dead.

18.     In fact, Radius Bank records show that the $15,049 wire cleared in the Polanco Consulting Services account and that the bank did not hold the wire as POLANCO claimed. Rather, the Radius Bank records show that POLANCO conducted a series of wire transfers and ATM withdrawals from the deposited funds. Specifically, on or about November 19, 2019, POLANCO wired $4,000 to himself at Bancorp Bank and $2,100 to a co-conspirator at TD Bank. On or about November 20, 2019, POLANCO wired $6,000 to himself at Bancorp Bank. On or about November 22, 2019, Polanco wired $1,005 to the same co-conspirator at TD Bank. Additionally, POLANCO made cash withdrawals of $502.95 on or about November 19, 2019, $504.95 on or about November 20, 2019, and $404.95 on or about November 21, 2019 from ATMs in Florida.

## **CONCLUSION**

19.     Based on the foregoing, there is probable cause to believe that POLANCO committed the following federal crimes:

a. money laundering, in violation of 18 U.S.C. § 1956(a)(3)(A) and (B), on or about October 31, 2019;

b. beginning on a date unknown, but no later than January 2019, conspiracy to commit money laundering to promote wire fraud and illegal drug smuggling and to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the wire fraud and drug smuggling operation, in violation of 18 U.S.C. § 1956(h);

c. wire fraud, in violation of 18 U.S.C. § 1343, on or about November 18, 2019 through a wire communication to CC-1 in Massachusetts; and

d. beginning on a date unknown but no later than November 2019, conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, with respect to the monies that POLANCO caused to be wired to the Polanco Consulting Services account at Radius Bank.

_____
Vivian M. Barrios
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to by telephone in accordance with Federal Rule of Criminal Procedure 4.1 this _____ day of July, 2021.
**Jul 29, 2021**

_____
Hon. Judith G. Dein
United States Magistrate Judge
District of Massachusetts

11